Filed 5/9/14  In re J.M. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re J.M., a Person Coming Under the Juvenile Court Law. | D065121 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. NJ14788C) |
| v. | |
| M.P., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Michael Imhoff, Commissioner.  Affirmed.

Elizabeth C. Alexander, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

M.P. (mother) contends the juvenile court erred in (i) denying her an evidentiary hearing on her Welfare and Institutions Code[1] section 388 petition after the court sustained, under section 300, subdivision (j), the petition of respondent San Diego County Health and Human Services Agency (Agency) on behalf of J.M.; (ii) denying her and Benjamin M. (Benjamin),[2] J.M.'s father and mother's live-in boyfriend, reunification services; and (iii) setting a hearing under section 366.26 to select and implement a permanent plan for J.M.  Affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

In early March 2013, the Agency filed a petition under section 300, subdivision (j) on behalf of then one-year-old J.M.  The petition alleged J.M.'s then three-year-old stepsister, J., had 38 rib fractures, a distended abdomen, bruising on multiple parts of her body, and she appeared to be malnourished.   The petition also alleged the injuries to J. "would ordinarily not be sustained except as the result of the unreasonable or neglectful acts or omissions of the parent," and thus J.M. was "at substantial risk of the same or similar injuries/detrimental condition as the result of the unreasonable or neglectful acts or omissions of the parent . . . ."  The Agency also filed section 300 petitions on behalf of J. and then seven-year-old J.A., J.M.'s stepbrother.

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise noted.

[2]     Benjamin is not a party in this proceeding.

The Agency's March 8, 2013 detention report stated that a few days earlier, J. was taken to Rady's Children Hospital (Rady's) emergency room; that J. had "bruising all over her body including small healed lacerations"; that she had "at least" 38 rib fractures, most of which were in the process of healing; that she had a "distended abdomen (possibly caused by trauma); and a possible injury to her liver due to trauma." The March 8 report stated that mother noticed that on March 1, J.'s abdomen was "swollen" and that J. had been vomiting and having diarrhea for the past one to two weeks. According to the report, mother worked full time and Benjamin was the primary caretaker of all three children.

The March 8 report included an interview of mother by an Agency social worker. Mother denied Benjamin had a temper or used physical means to discipline the children. Instead, mother claimed they used "time outs." Mother also denied any knowledge of the black eye and bump on J.'s head and how J. received these injuries, although mother stated about two or three weeks earlier J. fell and hit her mouth on the bathtub.

The March 8 report also included an interview with Benjamin. He could not provide any additional details regarding what happened to J., although he said J. tended to "fall and bump into things." Benjamin stated he noticed J. had not been eating the past few days. In response to the social worker's question about why J. had marks on her body and inner thigh, Benjamin stated J. scratched herself a lot because she has "itchy skin like eczema." Benjamin also told the social worker he heard J. fall three or four times recently, making a "thump, thump" sound but never saw what happened. He also denied any knowledge how J. got the black eye or the bump on her head.

3

The March 8 detention report noted J. had been admitted to the intensive care unit at Rady's and that J.M. and J.A. had been detained in a confidential licensed foster home.

Attached to the detention report was a statement by Kathleen Dully, M.D., a child abuse expert. Dr. Dully opined that there was "no logical, severe and forceful series of injury events to explain all [J.'s] injuries. The superimposed weight loss reported by [mother] over time, and gradual increasing abdominal distention with postponed medical intervention for the lip as well as for the abdomen, appears to be neglectful, especially when the original apparent extent and severity of the internal injuries is recognized. This appears to be Battered Child with facial, chest, abdominal and nutritional [*sic*] injuries. There does not appear to be any other logical explanation. This is severe child physical abuse."

The Agency's March 28, 2013 jurisdiction/disposition report noted that J. was still hospitalized at Rady's and her discharge date was then unknown. That report also noted an Agency social worker met with mother at Las Colinas Jail in mid-March 2013 and mother stated she blamed herself for J.'s injuries because she did not stand up to Benjamin, but instead sent J.M. into the room when the abuse of J. or J.A. was occurring in hopes Benjamin would stop. Mother told the social worker that as a child she suffered over the course of many years substantial physical and verbal abuse from her own mother and physical and sexual abuse from her stepfather. Mother admitted she noticed bruising on J. at the end of November or early December 2012, when J. began staying home with Benjamin.

4

Mother also admitted that she knew Benjamin had spanked J. with a belt because she saw bruising on J.'s bottom and legs; that in December of 2012, she noticed J.'s feet were swollen and said it was likely because Benjamin "probably had [J.] standing all day"; that she also saw bruising on J.'s inner thigh, which mother determined likely occurred when Benjamin grabbed J., held her leg up and "forced [J.] to stand on one leg for discipline"; that mother also saw bruising and scars on J.'s back; that Benjamin made J. take "cold showers" each time she had a toilet-training "accident"; that she was aware Benjamin also made J.M. and J.A. stand in the shower, "sometimes all day, with wet or soiled clothes on"; that she was aware that Benjamin made J. and J.A. at times "stand in the cold for hours"; and that one time when she awakened at 2:00 a.m., she saw J. was still standing in the corner.

When asked by the Agency's social worker about what Benjamin was doing to J. when he would take her into the bedroom and close the door, mother responded she could hear "thuds" behind the closed door and one time when she entered the room she saw J. on the floor crying. The social worker reported to mother that J.A. disclosed seeing Benjamin hitting J. with a broom multiple times because she was not doing her time out correctly and that this could have been one of the reasons J. sustained what the doctors believed was "blunt force trauma" causing J. substantial internal injuries.

The jurisdiction/disposition report noted that Benjamin denied any knowledge of J.'s injuries and instead claimed J. was a "very clumsy kid." That report further noted that Dr. Dully found J.'s stomach condition was pancreatitis probably caused by trauma such as a punch, kick or knee-type strike to the abdomen. J. also had a broken pelvis, which Dr.

5

Dully said was "very rare" and was an injury they might see on a child "once every ten years."

Mother was arrested for willful harm or injury to a child under Penal Code section 273a. Benjamin was also arrested and charged with 21 counts for violation of this same statute and was charged with torture under Penal Code section 206.

The jurisdiction/disposition report notes that shortly after J.A. was removed from the home a medical examination revealed a linear bruise on his right leg consistent with a belt mark and a round bruise on his right hip that could be accidental or nonaccidental. As for J.M., the medical examination showed he had a torn frenulum and bruises over the fleshy part of his face that were suspicious for inflicted trauma.

In speaking to police investigators, mother admitted that the day before she took J. to the hospital, Benjamin took J.A. into J.A.'s bedroom, closed the door and she heard "five whoops" that she said were consistent with J.A. being hit by a belt. Mother estimated that Benjamin had hit J.A. with a belt several times, including perhaps more than 10 times. After the beating, mother said she would rub J.A.'s injuries with ointment.

As also reflected in the jurisdiction/disposition report, mother also admitted to the investigators that one time when she came home from work she saw Benjamin punish J. by holding J.'s leg out to one side while J. stood on her other leg. Mother noticed then J. had bruising on her inner calf.

Mother said she also was aware that Benjamin was giving the children cold showers as a form of punishment. She noted the number of cold showers the children received depended on how many accidents they had in a given day. She further noted the showers

6

were always cold and most often the children had their clothes on while in the shower. Mother said if the children screamed when they received a cold shower, Benjamin would spray them in the face with additional cold water until they stopped.

Mother recalled an incident involving J.A. when Benjamin made J.A. kneel down on the tile floor in the kitchen, put towels around him and then poured cold water over his head. Mother said this occurred at about 1 or 2 a.m. Mother also said Benjamin opened the sliding glass door in the room to make it cooler and more uncomfortable for J.A., who was shivering. According to mother, Benjamin kept J.A. up for 24 hours as punishment.

Mother admitted to police investigators that she was aware of all the injuries to J. because she "was the one healing her wounds." Mother also said she "knew the abuse was going on and was afraid to get her children treatment because she didn't want to be in the situation she is in now." Mother tried to "fix it but didn't know how and was afraid and embarrassed to ask for help and didn't know how to protect her children from this man."

In late March 2013, the Agency filed amended petitions on behalf of J.M., J.A. and J. As relevant here, the petition on behalf of J.M. added three additional counts. Count 2 alleged that between November 2012 and early March 2013 (until J.M. was removed from the home), that there was a substantial risk J.M. would suffer serious physical abuse by Benjamin as provided in section 300, subdivision (e) based on the serious and substantial injuries his half-sister J. sustained. Count 2 also alleged J.M. was at substantial risk of being abused or neglected as provided in subdivision (j) of section 300.

Count 3 alleged that mother knew, or reasonably should have known, that Benjamin was physically abusing J.M.'s siblings, which placed J.M. at substantial risk of physical abuse as provided under subdivision (e) of section 300. Count 3, like count 2, also included an allegation under subdivision (j) of section 300.

Finally, count 4 alleged J.M.'s sibling, J., had been subjected to acts of cruelty by Benjamin, including requiring her to stand in a cold shower for extended periods of time, up to and including all day, while fully clothed. As such, count 4 alleged J.M. was also at substantial risk that he too would be subject to such acts of cruelty by Benjamin, his father, pursuant to subdivision (j) of section 300.

In early June 2013, the court sustained all four counts of the section 300 petition on behalf of J.M., finding the allegations true by clear and convincing evidence. On June 25, 2013, the court declared J.M. a dependent and removed him from parental custody; it denied reunification services to mother and Benjamin, as recommended by the Agency, and scheduled a hearing under section 366.26 to select and implement a permanent plan. The court ordered no visitation for either parent, but set a special hearing for early September 2013 to address visitation once mother was released from custody.

In its June 25, 2013 addendum report the Agency prepared in connection with the contested disposition hearing, it noted J. displayed symptoms of posttraumatic stress related to the abuse she endured while living with mother and Benjamin. During individual therapy sessions, J. regularly played out themes having to do with safety, getting enough to eat and spankings.

8

In the Agency's September 5, 2013 addendum report prepared in connection with the special visitation hearing for mother, the social worker noted she had met with J.M. and his caregiver and had reviewed the Developmental Screening and Enhancement Program (DSEP) report concerning J.M. The DSEP report expressed concerns regarding "J.M.'s communication, fine motor and personal-social development" and his "emotional reactivity, aggressive behavior and social emotional" behavior. These concerns were also expressed by J.M.'s caregiver, who further reported J.M. was hard to discipline, was not using words or pointing to things to express his wants or needs and was biting and scratching himself and others.

In the September 5 addendum report the social worker recommended supervised visitation between J.M. and mother, who had been released from custody in late August 2013, and was then residing at a residential treatment center. The record shows the court ordered supervised visits between J.M. and mother.

The Agency's October 22, 2013 report prepared in connection with the selection and implementation hearing under section 366.26 noted Benjamin had been sentenced to nine years in state prison and noted mother had received four years formal probation, 365 days in custody and ordered to complete a 52-week child abuse class and participate in any psychiatric/counseling if directed by probation.

With regard to J.M., the October 22 report noted that he had a developmental evaluation through Rady's and was found to have cognitive functioning at the "low end of average, average fine motor skills, low average gross motor skills, concerns about speech and language progression, and adjustment disorder, specified by emotional and behavioral

9

concerns directed toward self and others, secondary to past trauma and disruption in attachment with primary caregivers and separation from sibling." It further noted J.M. was undergoing DSEP services and was receiving weekly, in-home services from a behavior specialist who found that J.M. was having a "hard time regulating" and that his tantrums continue "the rest of the day."

J.M.'s caregiver reported he kicks the dog and other children, including his brother J.A. who also lives with the caregiver, "does not like the bathtub, and will pinch his ear until it bruises." The caregiver said J.M. will bite himself if the caregiver stops him from biting others, and J.M. continues to go "very rigid and throw his head forward, or back, hurting himself or others" when he has a tantrum. It was recommended, based on J.M.'s history and behavior that he would benefit from treatment for posttraumatic stress disorder (PTSD).

The Agency social worker described in the October 22 report three visits between J.M. and mother. The first visit took place at mother's residential treatment center in mid-September 2013. The social worker noted J.M. cried when separated from his caregiver. However, he let mother hug him and quieted when mother sang him a familiar song. J.M. rarely made eye contact with mother. During some of the visit, he turned his back on her and when she tried to engage him, he "would just be floppy." Following the visit, the caregiver reported J.M. for a few hours was unusually quiet and withdrawn.

The second visit took place a week later, again at mother's treatment center. When J.M. saw mother, he began to walk backwards and looked to be picked up by his caregiver. J.M. then began to cry. Mother approached the caregiver, who encouraged J.M. to go to

10

mother.  Mother took J.M., put his head against her shoulder and sang to him as she walked away with him.  J.M. was comforted.

During the visit, the social worker observed J.M. was sullen and clingy.  Although J.M. made eye contact with the social worker and those who approached him, he often did not make eye contact with mother, although he did "snuggle his head into her shoulder."  J.M. remained mainly "limp" and "lethargic" for most of the visit and generally had no interest in playing with any toys or mother.  In fact, when mother tried to engage J.M. in "physical play" by lifting him up above her as she lay on the ground, he "remained floppy as a rag doll, and then came in close to her, to lay on her, when he could."  The social worker observed that J.M. smiled only once during the visit, when mother gave him a snack, that he said no words during the entire visit, but that he did point and/or verbalize four times.  When the visit ended, J.M. ran to the caregiver with his arms outstretched.  J.M. allowed mother to hold him when they said goodbye.

The third visit took place in early October 2013, again at mother's treatment center.  J.M. cried when the caregiver handed him over to mother.  J.M. quieted when mother sang to, and snuggled, him.  After eating a snack, J.M. pointed to a tetherball and verbalized, not using words but instead with sounds.  Mother took J.M. over to play.

According to the social worker, after mother finished singing a song to J.M., J.M. "verbalized what sounded close enough to 'again' and [mother] responded by singing again."  They next went to a playroom, where J.M. let mother take his picture and then played with blocks while sitting next to mother.  J.M. smiled and for the first time moved off her lap.  At the end of the visit, J.M. "jumped into her arms with a smile," helped put the blocks away at

11

mother's encouragement and gave her "five." J.M. held out his hands to the caregiver, with a big smile.

The October 22 report noted that mother was worried about J.M.'s assessments of developmental delay and behavioral concerns; that she has been "anxious to comply with any agency regulations, in order to visit with [J.M.]"; and that she has remained in "steady" contact with the Agency and has attended various meetings to "discuss treatment options for [J.M.], participating and providing information."

The Agency social worker involved in all three visits concluded that mother's role with J.M. at that time was that of a "friendly visitor." J.M. seemed to remember his mother, although the social worker observed that he "remains confused in her presence." J.M. appeared to becoming more comfortable in her company. In addition, the social worker noted that J.M. cries when separated from the caregiver and runs to the caregiver when the visits end, but does not respond when separating from mother. The social worker concluded "[J.M.] would not suffer detriment should [mother's] parental rights be terminated."

In the assessment/evaluation portion of the October 22 report, the Agency social worker stated that although J.M. was in need of developmental and behavioral services, he was adoptable. The report also noted J.M. had no contact with his mother for five months while she was in custody; that to date her role (as noted) was that of a "friendly visitor"; that in the three visits witnessed by the social worker, J.M. has shown "impaired attachment" with mother and seems relieved when he is reunited with his caregiver; that J.M. lived in a home where he was exposed to "very severe abuse" on his siblings by Benjamin, and thus it

12

was recommended he also receive treatment for PTSD; and that J.M. also might have been physically abused while in the home.

The October 22 report recognized mother loved her children and was deeply regretful for what had happened to them. It also noted mother had received a psychological evaluation in May 2013 in which mother was advised to obtain individual therapy to "resolve the conflicts relating to her years of abuse, both physical and sexual, rejection by family, and maltreatment by others." The psychological evaluation noted that although mother desired to pursue treatment, it was not certain that the "recommended therapy could proceed quickly enough given the time demands of reunifying with children in the juvenile dependency system."

The Agency's October 22 report pointed out that mother had not begun her 52-week child abuse coursework and that her visitation with J.M. had not progressed beyond one hour, supervised, per week. It concluded that J.M.'s need for a "permanent, stable home where he can grow up safely and where he can belong, outweighs any detriment he would suffer, should [mother's] parental rights be terminated." As such, the Agency recommended the court terminate mother's parental rights and find adoption was in J.M.'s best interests.

The record shows the matter came before the court for a section 366.26 hearing in late October 2013. The court continued the matter to November 21, 2013. Before the next hearing, mother filed a section 388 petition, asking the court to change the order denying her reunification services, to vacate the section 366.26 hearing and either to return J.M. to her care or to order reunification services for her. Both the Agency and counsel for J.M. opposed the petition.

13

In support of mother's petition, mother noted that since her release from custody in late August 2013, she had been enrolled in a residential treatment center; that her counselor at the center stated mother had shown a "positive attitude toward treatment and [her] own recovery"; that since undergoing treatment, she had participated in all "groups and meetings available to her" and all drug tests have been negative; that she started basic parenting classes the first week in October, 2013 and has remained an "active participant" in such classes; and that she also attended individual therapy at the center, where she was diagnosed with bipolar disorder for which she was receiving medication.

The Agency addendum report dated November 21, 2013 recognized mother had filed a section 388 petition but nonetheless recommended adoption as the best permanent plan for J.M. The November 21 report stated J.M. continued to struggle with certain behaviors despite intervention, including "aggressive hitting, kicking, and biting of other children, and if not allowed to do harm [to] others, he will then turn and harm himself, biting himself and pinching his ear until it bruises."

The Agency in its November 21 report recognized mother's efforts to change her behaviors, but noted her treatment had just begun and she had not yet demonstrated the ability to "manage the stresses of day to day life without reverting to previous patterns." In light of J.M.'s young age, his diagnosis of PTSD and his need for "day to day care and therapeutic intervention," the Agency reiterated the "benefits of permanency outweigh the detriment [J.M.] will suffer if parental rights are terminated." The Agency noted, however, it would work to identify a home for J.M. "open to continued healthy contact with [mother], and with J.M.'s maternal siblings."

14

After considering the petition and its attachments and the Agency's November 21 addendum report, the juvenile court summarily denied without prejudice mother's section 388 petition, ruling she did not proffer sufficient evidence to overcome the "specific findings" it made at disposition under section 361.5, subdivisions (b)(5) and (b)(6).[3] The court further ruled that under section 361.5, subdivision (c),[4] once the court makes a finding

---

[3]     Subdivision (b) of section 361.5 provides: "Reunification services need *not* be provided to a parent or guardian described in this subdivision when the court finds, by clear and convincing evidence, any of the following: . . . (5) That the child was brought within the jurisdiction of the court under subdivision (e) of Section 300 because of the conduct of that parent or guardian.  (6) That the child has been adjudicated a dependent pursuant to any subdivision of Section 300 as a result of severe sexual abuse or the infliction of severe physical harm to the child, a sibling, or a half sibling by a parent or guardian, as defined in this subdivision, and the court makes a factual finding that it would not benefit the child to pursue reunification services with the offending parent or guardian."  (Italics added.) Subdivision (b)(6) of section 361.5 states a "finding of the infliction of severe physical harm, for the purposes of this subdivision, may be based on, but is not limited to, deliberate and serious injury inflicted to or on a child's body or the body of a sibling or half sibling of the child by an act or omission of the parent or guardian, or of another individual or animal with the consent of the parent or guardian; deliberate and torturous confinement of the child, sibling, or half sibling in a closed space; or any other torturous act or omission that would be reasonably understood to cause serious emotional damage."  Subdivision (e) of section 300, referenced in subdivision (b)(6) of section 361.5, provides in part a child is within the jurisdiction of the juvenile court and is a dependent of the court if "(e) The child is under the age of five years and has suffered severe physical abuse by a parent, or by any person known by the parent, if the parent knew or reasonably should have known that the person was physically abusing the child.  For the purposes of this subdivision, 'severe physical abuse' means any of the following: any single act of abuse which causes physical trauma of sufficient severity that, if left untreated, would cause permanent physical disfigurement, permanent physical disability, or death; any single act of sexual abuse which causes significant bleeding, deep bruising, or significant external or internal swelling; or more than one act of physical abuse, each of which causes bleeding, deep bruising, significant external or internal swelling, bone fracture, or unconsciousness; or the willful, prolonged failure to provide adequate food."

[4]     Subdivision (c) of section 361.5 states in part:  "[T]he court shall *not* order reunification in any situation described in paragraph (5) of subdivision (b) *unless* it finds

15

under subdivision (b)(5) of that same statute mother was required to present competent evidence that reunification services are likely to prevent reabuse, which it noted mother had not proffered.

As to the finding under subdivision (b)(6) of section 361.5 that the child was a dependent based on the finding of severe physical harm to the child or to the child's sibling, the juvenile court found that the "best interests for ordering services has to be assessed within that context" and that for mother to make such a showing, it needed "information with respect [to mother's] therapeutic progress, specifically on insight into how the children have been injured, how they are reacting, and what type of parental strategy would be provided to assist the children."

The court also found it would not be in J.M.'s best interests to grant the relief requested "given the description of J.M.'s difficulties, his diagnosis of post traumatic stress disorder, which in and of itself is a very tricky diagnosis . . . .    And there needs to be a lot of work and effort to put in to understanding what the triggers are in post traumatic stress disorder diagnoses, and we need to have further input with respect to J.M.'s triggers.  I don't discount [mother's] interpretation of J.M.'s clinginess, but I would need much more expert opinion to guide the court that it's primarily due to his issue of separation from his mother rather than issues of protection and fear and things of that nature given his diagnosis."

---

that, based on competent testimony, those services are likely to prevent reabuse or continued neglect of the child or that failure to try reunification will be detrimental to the child because the child is closely and positively attached to that parent."  (Italics added.)

16

DISCUSSION

Mother contends the court erred when it summarily denied without prejudice her section 388 petition. Any party may petition the juvenile court to modify or set aside a prior dependency order pursuant to section 388. To trigger the right to a full evidentiary hearing, the section 388 petition must include a prima facie showing of facts that if credited, will sustain a favorable decision. (See also *In re Marilyn H.* (1993) 5 Cal.4th 295, 310; *In re Edward H.* (1996) 43 Cal.App.4th 584, 592.) The petition is to be liberally construed, which is to say it is "construed in favor of granting a hearing to consider the parent's request." (*In re Marilyn H.*, *supra*, at p. 309; *In re Jeremy W.* (1992) 3 Cal.App.4th 1407, 1413-1414.)

" 'There are two parts to the prima facie showing: The parent must demonstrate (1) a genuine change of circumstances or new evidence, and that (2) revoking the previous order would be in the best interests of the children.' " (*In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1079.) "If the liberally construed allegations of the petition do not make a prima facie showing of changed circumstances and that the proposed change would promote the best interests of the child, the court need not order a hearing on the petition." (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806; *C.J.W.*, *supra*, at p. 1079.)

We review the summary denial of a section 388 petition for an abuse of discretion. (*In re Marcos G.* (2010) 182 Cal.App.4th 369, 382; see also *In re Stephanie M.* (1994) 7 Cal.4th 295, 317-318 [noting whether the juvenile court should modify a previously made order rests within its discretion and " ' "a reviewing court will not disturb that decision unless the trial court has exceeded the limits of legal discretion by making an arbitrary,

17

capricious or patently absurd determination . . . ." ' "].)  If the liberally construed allegations of the petition do not make the required prima facie showings of *both* changed circumstances and best interests, the denial of the petition without a hearing does not violate the petitioner's due process rights.  (*In re Angel B.* (2002) 97 Cal.App.4th 454, 460-461.)  In ruling on a modification petition, the court may consider the entire factual and procedural history of the case.  (*In re Justice P.* (2004) 123 Cal.App.4th 181, 189.)

Liberally construed, the petition showed that mother had been living in a residential treatment center for only three months after she was released from custody in late August 2013 following her guilty plea to felony child abuse; that mother started basic parenting classes at the treatment center the first week in October 2013, which was less than two months before she filed her section 388 petition (which was heard in late November 2013); and that mother was taking medication for depression and for a bipolar disorder and was participating in therapy and parenting classes while living in the treatment center.

Although mother was making commendable efforts to address the multiple issues that led to the *severe* physical abuse/harm of J. and J.A. by Benjamin as summarized *ante* that was known to mother (she admitted treating the children's ongoing injuries and hearing "thumps" when Benjamin would beat the children), we conclude on this record the juvenile court's determination was not " ' "arbitrary, capricious or patently absurd" ' "  (see *Stephanie M.*, *supra*, 7 Cal.4th at p. 318) when it summarily denied without prejudice mother's section 388 petition because she did not make a prima facie showing of a *change* of, as opposing to *changing*, circumstances to warrant a full hearing.  (See § 388, subd. (a); cf *In re Aljamie D.* (2000) 84 Cal.App.4th 424, 427 [reversing juvenile court order denying a mother an

18

evidentiary hearing pursuant to her section 388 petition when the mother proffered evidence showing that she had tested clean in weekly random drug tests for over *two years*, that she had *completed* parenting classes *and* a drug rehabilitation plan, and that there was a close bond between her and the children as evidence by the fact mother lived with the children and their caretaker (i.e., the maternal aunt) and had "unmonitored" visitation with them].)

Moreover, as noted by the juvenile court, under subdivision (c) of section 361.5 a court *shall not* order reunification if, as in the instant case, there has been a finding under subdivision (b)(5) of that statute that the child was a dependent as provided in subdivision (e) of section 300,[5] "unless it finds that, based on competent testimony, those services are likely to prevent reabuse or continued neglect of the child or that failure to try reunification will be detrimental to the child because the child is closely and positively attached to that parent."

Here, we separately conclude the juvenile court did not clearly abuse its discretion when it found mother's section 388 petition did not meet the standard set forth in subdivision (c) of section 361.5. Indeed, similar to the (tacit) finding mother's circumstances were changing, here the record shows the services she was receiving from the treatment center *may* prevent reabuse. However, it was not an abuse of discretion for the juvenile court to find (tacitly) that those services were "likely" to prevent reabuse, as

---

[5]     As noted, subdivision (e) of section 300 generally provides a child is subject to the jurisdiction of the juvenile court if "the child is under the age of five years and has suffered severe physical abuse by a parent, *or by any person known by the parent, if the parent knew or reasonably should have known that the person was physically abusing the child*." (Italics added.)

19

required by subdivision (c) of section 361.5. This is so particularly given that mother had only been a resident in the treatment center for three months and had just begun therapy and parenting classes.

In addition, the record shows mother had only three visits with J.M. before the court heard her section 388 petition. The record supports the finding of the Agency social worker in the Agency's October 22 report, summarized *ante*, that mother's role with J.M. at that time was that of a "friendly visitor." Indeed, the social worker noted that although J.M. was becoming more comfortable around mother, he still appeared confused when with her. The social worker also noted J.M. cried when separated from his caregiver and ran to his caregiver when the visits with mother ended, but did not similarly respond when separating from mother. Thus, although J.M. was becoming more comfortable with mother, the record does not support the (tacit) finding he was "closely and positively attached" to her as required by subdivision (c) of section 361.5.

Finally, even if we concluded the juvenile court clearly abused its discretion when it found no change of circumstances in summarily denying mother's section 388 petition and when it found mother did not proffer sufficient evidence to satisfy her burden under section 361.5, subdivision (c), we nonetheless would affirm the order because we also conclude mother did not make a prima facie showing (required to obtain a full hearing) that revoking the order denying her reunification services would be in J.M.'s best interest. (See § 388, subds. (a) & (c); see also *C.J.W.*, *supra*, 157 Cal.App.4th at p. 1079.)

20

In *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 532, the court identified three principal factors relevant to the juvenile court's evaluation of best interests in the context of a section 388 petition: (1) the seriousness of the problem that necessitated dependency and the reason the problem continued; (2) the strength of relative bonds between the dependent child and the parent and caretakers; and (3) the degree to which the problem may be easily removed and the degree to which it actually has been.

Applying the *Kimberly F.* factors here, the record shows that J. and J.A. were subjected to *severe* physical abuse and that J.M. also might have been subject to such abuse; that although J.M. was only about a year old when the abuse began, he was aware of it because mother admitted she would send J.M. into the room where Benjamin was abusing J.M.'s siblings in an effort to get Benjamin to stop; and that mother knew Benjamin was severely abusing the children because she was treating the children's injuries and because she heard the abuse. It is clear from the record there was a "serious" problem in this case, as perhaps best evidenced by the fact that J. had 38 fractures to her ribs when she was admitted at Rady's, as well as serious other physical injuries, and the fact J.M. is suffering PTSD at such a young age.

Moreover, as we have discussed the bond between mother and J.M. was similar to that of a "friendly visitor," as noted by the Agency social worker who observed all three visits between them leading up to the section 388 petition.

Finally, the third *Kimberly F.* factor also suggests it would not be in J.M.'s best interest to order reunification services for mother (or to place J.M. with mother with services). As noted *ante*, although the record shows mother was making commendable

21

strides in treatment, the record does not support a finding that mother had ameliorated the problems that caused her to ignore the severe child abuse of J., which led Dr. Dully to conclude J. was a battered child, and of J.A., and perhaps to a lesser extent, of J.M., by Benjamin when she admitted knowing of the abuse and even hearing and witnessing it. We thus conclude the juvenile court did not abuse its discretion when it summarily denied without prejudice mother's section 388 petition because she did not make a prima facie showing it would be in J.M.'s best interest to vacate the section 366.26 hearing and order reunification services for her.

## DISPOSITION

The order summarily denying without prejudice mother's section 388 petition is affirmed.

BENKE, Acting P. J.

WE CONCUR:

HALLER, J.

McDONALD, J.

22